IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

06 SEP 28 PM 2:08

| | |
|---|---|
| CARRIE GERVAIS, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | CASE NO. CV 03-B-0074-NW |
| } | |
| LAUDERDALE COUNTY BOARD } | |
| OF EDUCATION, et al., } | |
| } | |
| Defendants. } | |

**ENTERED**
SEP 28 2004

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendants Lauderdale County Board of Education, Jerry Fulmer, in his official capacity as Superintendent of Education of Lauderdale County, and Larry Hill (collectively "the Board"). (Doc. 14.) Plaintiff, Carrie Gervais, asserts claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments for a violation of the right to freedom of association. (Doc. 1 ¶ 19.) Plaintiff also seeks damages, back pay, and equitable relief in the form of reinstatement as a teacher and any difference in pay and benefits suffered. (Doc. 1 ¶¶ 20-22.) Upon consideration of the record, submissions of the parties, arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment is due to be granted.

I.   **Factual Summary**[1]

Plaintiff Carrie Gervais was employed by the Lauderdale County Board of Education as a teacher for hearing impaired students during three school years: 1999-2000, 2000-01, and 2001-02. (Doc. 1 ¶ 2; Doc. 16, Ex. 2 at 2, 3; Doc. 19, Ex. 1 ¶ 2.) Plaintiff was a probationary employee during this time; she did not have tenure. (Doc. 16, Ex. 2 at 2.) On July 15, 2002, plaintiff applied for the same job she held the three previous years. (Doc. 19, Ex. 1 ¶ 2.) The Board did not post the job vacancy until July 22, 2002, and left it posted for 14 days, until August 4, 2002.[2] (*Id.*) Ultimately, plaintiff was not re-hired for the 2002-03 school year, which would have allowed her to obtain tenure status. (Doc. 16, Ex. 2 at 2.)

During her three years of employment, plaintiff worked under two different principals, Larry Hill and Kenneth Koss, at two separate schools, Wilson High School and Cloverdale Middle School. (Doc. 16, Ex. 2 at 1-2; Ex. 3 at 1.) At the end of her second year of teaching, in May of the 2000-01 school year, plaintiff's contract was initially not renewed, which was a fairly standard procedure for all probationary employees. (Doc. 16, Ex. 2 at 3.) By not renewing teaching contracts for probationary employees, the Board allowed itself the opportunity to assess its needs for the next year

---

[1] For purposes of the Motion for Summary Judgment, all facts and reasonable inferences therefrom are drawn in favor of the plaintiff.

[2] Contrary to this statement in her declaration, plaintiff, in her brief, alleges the job vacancy was never posted. Fulmer and Hill also stated in their affidavits that notice of the job vacancy was advertised as required by state law. (Doc. 16, Ex. 1 at 3; Ex. 2 at 4.)

-2-

and determine who should be re-employed. (*Id.*; Doc. 19, Ex. 5 at 11, 19-20.) During the summer of 2001, the Board considered not rehiring plaintiff, but "ultimately decided to do so because [they] were concerned about the availability of teachers trained to teach hearing impaired students. These discussions took place with the special education coordinator and the superintendent." (Doc. 16, Ex. 2 at 3.)

In July 2001, Hill recommended plaintiff be employed for the 2001-02 school year. (*Id.*) Plaintiff disagrees with Hill's recollection of the date she was rehired. She states she was re-hired for her third year at the end of June 2001. (Doc. 19, Ex. 1 ¶ 15.) She believes Hill and Vicki Willard both wrote the superintendent to request that she be re-hired on June 26. (*Id.*) Plaintiff also states she was re-hired by the board on June 28, 2001, and received a letter, dated June 29, 2001, notifying her of the decision. (*Id.*) Both principals recommended to superintendent Fulmer that plaintiff not be re-employed after her probationary contract for the 2001-02 school year expired. (Doc. 16, Ex. 1 at 2.) When Fulmer met with Hill, Hill cited concerns with plaintiff's job performance. (Doc. 16, Ex. 1 at 2; Ex. 2 at 2, 5.) Hill thought plaintiff failed to stay in the classroom or with her students the appropriate amount of time. (Doc. 16, Ex. 1 at 2.) Hill also had concerns about whether she followed her schedule, and he continued to have problems with plaintiff after discussing them with her. (*Id.* at 2-3.) Koss felt plaintiff lacked the appropriate amount of dedication to her job that was expected, and she did not perform her duties and responsibilities in a satisfactory manner. (Doc. 16, Ex. 3.) Koss believed plaintiff did not focus on teaching her student, and she failed to spend the allotted time

with the student because she was more interested in chatting with other employees, spending time in the hall, and spending time in the teachers' lounge. (Doc. 16, Ex. 3 at 1.)

In her declaration, plaintiff describes her job description and the type of work she performed. (Doc. 19, Ex. 1.) While under Koss at Cloverdale School, she had daily thirty minute sessions with one student, "Jennifer", who was nonverbal. (Doc. 19, Ex. 1 ¶ 3.) Plaintiff also stated she was required to be in the teachers' lounge twice each day to sign in and out. (*Id.*) Plaintiff felt Jennifer did not have the manual dexterity to sign, so they worked on social skills. (*Id.*) Plaintiff also tried to prevent her from hugging everyone she saw. (*Id.*) Plaintiff spent extra time in the workroom on the many days Jennifer was absent from school. (*Id.*) Koss never spoke to plaintiff, never evaluated her, and only nodded when he passed her. (*Id.* ¶ 4.) Koss was introduced to plaintiff by a secretary as "Ms. Rager's sister." (*Id.* ¶ 6.) Plaintiff never had any problems with the main classroom teacher, Lisa McDougal, but there were problems with a substitute teacher who knew nothing about what plaintiff was supposed to be doing. (*Id.* ¶ 5.)

Plaintiff notes that Hill complained about her chatting in the hall, but says he did not reprimand the other individuals to whom she was talking. (*Id.* ¶ 8.) Plaintiff also states that Hill's complaints about her not following the class schedule were solved after Hill received plaintiff's updated schedule. (*Id.* ¶ 10.) Plaintiff only recalls three times when Hill spoke to her about problems. (*Id.* ¶¶ 11, 12.) Plaintiff contends that another

special education teacher, Scott Brown, never did anything other than surf the net and read the newspaper. (*Id.* ¶ 14.)

Plaintiff's sister, Leslie Rager, was an advocate for a special education student, Jesse Price, who attended Wilson High School. (Doc. 16, Ex. 2 at 4.) Plaintiff believes her sister's advocacy became an issue with Hill during her third year of teaching. (Doc. 19, Ex. 3 at 51.) Hill knew plaintiff and Rager were sisters at the time plaintiff was hired. (Doc. 16, Ex. 2 at 4; Doc. 19, Ex. 3 at 51.) He also knew Rager was a parent advocate for special education prior to plaintiff's hire. (Doc. 16, Ex. 2 at 4; Doc. 19, Ex. 3 at 96.) The Price case began in March 2001, prior to Hill's decision in June or July 2001 to recommend plaintiff for re-employment for the 2001-2002 school year. (Doc. 16, Ex. 2 at 4.) Hill was well aware of the Price case prior to making his decision. (*Id.*) According to Hill, Rager's position and the Price case were not factors in his decision to not recommend rehiring plaintiff. (*Id.*) Koss also testified that his decision was not influenced by plaintiff's relationship with Rager. (Doc. 16, Ex. 3 at 2-3.) Rager's relationship to plaintiff was never mentioned in superintendent Jerry Fulmer's discussions with Hill or Koss. (Doc. 16, Ex. 1 at 3.) According to Fulmer, the fact that Rager was plaintiff's sister and a special education advocate never entered his mind when he recommended that the Board not renew plaintiff's contract. (*Id.*)

After plaintiff was not re-employed, the position was advertised as required by state law. (Doc. 16, Ex. 1 at 3.) Several applications were received, including plaintiff's and Regina Wardelman's. (*Id.*) Hill and assistant principal Regina Adams interviewed

plaintiff and Wardelman. (Doc. 16, Ex. 1 at 3; Ex. 2 at 4; Ex. 4 at 2.) Prior to plaintiff's interview, Hill discussed with Adams job performance issues he had with plaintiff, but he never mentioned anything about plaintiff's sister. (Doc. 16, Ex. 4 at 2-3.) According to Hill and Adams, Wardelman was hired because Hill and Adams believed she was the best qualified candidate with better credentials; "[s]he had a master's degree . . . [a]nd she interviewed very well." (Doc. 16, Ex. 4 at 2-3; Ex. 2 at 4-5.) Hill and Adams expressed to Fulmer that they believed Wardelman was the best qualified candidate for the job, and Fulmer recommended to the Board that Wardelman be hired. (Doc. 16, Ex. 4 at 2-3; Ex. 2 at 4-5; Ex. 1 at 3.) After plaintiff was not hired for the position, she filed this suit on January 13, 2003. (Doc. 1.)

## II.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met her burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  Discussion

"A fundamental proposition in our constitutional jurisprudence is that government employment may not be conditioned upon a relinquishment of a constitutional right, including the rights to speech and association guaranteed under the First Amendment." *Wilson v. Taylor*, 658 F.2d 1021, 1027 (5th Cir. Unit B 1981). When examining whether individuals have been fired for reasons which infringe upon a constitutional right, courts have applied the tests set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). In *Mt. Healthy*, the Supreme Court set out a three part test for judging public school teachers' First Amendment claims. *Hatcher v. Bd. of Public Educ. and Orphanage for Bibb County, et al.*, 809 F.2d 1546, 1556 (11th Cir. 1987). First, the court must determine whether plaintiff has shown that her activity is protected by the First Amendment. *Mt. Healthy*, 429 U.S. at 287; *Holley v. Seminole County School Dist.*, 755

F.2d 1492, 1500 (11th Cir. 1985). If the conduct is protected, plaintiff bears the burden of proving the protected conduct was a substantial or motivating factor in the decision to take adverse action against plaintiff. *Holley*, 755 F.2d at 1500; *Mt. Healthy*, 429 U.S. at 287. Once plaintiff meets her burden, the board must then show, by a preponderance of the evidence, the same employment decision would have been made absent the protected conduct. *Mt. Healthy*, 429 U.S. at 287.

### A.   Protected Activity

The Supreme Court held, in *Connick v. Myers*, 461 U.S. 138, 146-47 (1983), that unless the employee's conduct involves a matter of public concern, it is inappropriate to examine the propriety of the employer's action. *Hatcher v. Bd. of Public Educ. and Orphanage for Bibb County, et al.*, 809 F.2d 1546, 1556 (11th Cir. 1987). The *Hatcher* court found that the *Connick* court applied a two-step analysis in its freedom of speech analysis, but the *Hatcher* court later concluded "that *Connick* is inapplicable to freedom of association claims." *Id.* at 1557 n.19, 1558.

Associate is defined as: "to join as a partner, friend, or companion . . . [or] to bring together or into [a] relationship in any of various intangible ways (as in memory or imagination)." Merriam-Webster's Collegiate Dictionary 70 (10th ed. 1997). In *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984), the court found that freedom of association extended to a police officer dating another individual. However, the court noted, "[t]his is a narrow holding. We do not hold that a law enforcement officer may never be fired because of associations with others." *Id.* at 1544 n.3 (emphasis in original). The court in

*Swank v. Smart*, 898 F.2d 1247, 1252 (7th Cir. 1990), *cert. denied*, 498 U.S. 853, found that "it is sometimes suggested – erroneously, . . . – that the First Amendment protects nonexpressive associations." The Seventh Circuit then found that *Wilson* was the principal case with this "erroneous" holding. *Id.* at 1252. The Third Circuit has held that a party's association with her brother-in-law was not constitutionally protected. *Rode v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir. 1998). However, the Tenth Circuit, in *Trujillo v. Bd. of County Comm'rs of City of Santa Fe*, 768 F.2d 1186, 1188-89 (10th Cir. 1985), found that a mother and daughter's relationship with a son or brother was protected.

In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the court found there are two types of associations. There are associations based upon intimate human relationships, which receive constitutional protection as "fundamental element[s] of personal liberty," and associations created "for the purpose of engaging in those activities protected by the First Amendment . . . ." *Id.* at 617-18. There is no evidence showing that plaintiff and Rager have asserted or formed an associational relationship for the purpose of engaging in protected activity. A nonexpressive, intimate associational relationship exists between plaintiff and her sister, Leslie Rager.

The instant case differs from most, if not all, other freedom of association cases in that plaintiff, despite having an intimate relationship, through birth, with her sister, has failed to assert sufficient evidence that she actually engaged in protected activity that would be subject to Constitutional protection. Plaintiff is simply the sister of an advocate

for parents of disabled children. This court believes a non-expressive sister-sister relationship, by itself, is insufficient to support a finding that plaintiff's activity is protected by the First Amendment. There are no instances in the record showing plaintiff actively supported her sister's activities. For example, no evidence was presented that plaintiff attended meetings or voiced her support for her sister's advocacy for a special education student. Plaintiff did teach hearing impaired children while employed by the Board, which is an occupation of public concern because society benefits from the education the students receive. Plaintiff's occupation is the closest form of support plaintiff has shown for her sister's activities. However, teaching hearing impaired students, in and of itself, is not enough for an individual to be engaged in protected activity; plaintiff must be *engaged* in protected activity. For example, the plaintiff in *Pickering* was a teacher, but she actively engaged in protected activity by writing a letter to the editor of a local newspaper criticizing the school board's actions. *Pickering v. Board of Education*, 391 U.S. at 571.

This court is not convinced plaintiff engaged in protected activity. However, without deciding, the court will assume plaintiff was engaged in protected activity, and the court will address whether plaintiff's conduct was a substantial or motivating factor of the Board in its decision not to re-hire plaintiff.

**B.   Substantial or Motivating Factor**

After a plaintiff addresses whether her activity is protected activity, she must then show that her conduct was a substantial or motivating factor in her employer's personnel decision. *See Hatcher*, 809 F.2d at 1557 n.19; citing *Holley*, 755 F.2d at 1500.

In *Cutcliffe v. Cochran*, 117 F.3d 1353, 1355 (11th Cir. 1997), plaintiff deputy sheriffs sued under the First Amendment after being dismissed by the sheriff due to their familial relationship with the sheriff's political nemesis. Plaintiffs alleged their dismissal violated their rights to exercise political speech, familial association, and political affiliation or association, which are protected speech and association under 42 U.S.C. § 1983. *Id.* The Eleventh Circuit held plaintiffs were required to present evidence allowing "a rational fact-finder to conclude that their . . . protected conduct was a substantial factor in their dismissals." *Id*; citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). After plaintiffs presented "little more than the fact of their familial relationship" to show the relationship was a substantial or motivating factor in their dismissals, the court found plaintiffs failed to present a question of material fact to necessitate the issue being presented to a jury. *Id.*

The instant case is analogous to *Cutcliffe*. The adverse action forming the basis of this suit is that plaintiff was not re-hired for her position as teacher for hearing impaired students. She alleges the reason the Board did not re-hire her is her relationship with her sister, an advocate for disabled children. Prior to and during the time plaintiff was being considered for re-hire as a teacher, plaintiff's sister, Leslie Rager, was actively

representing a disabled child, Price, in an action against the Board. Plaintiff believes this connection between Price and Rager, and then Rager and plaintiff, creates a logical connection for her association claim.

It is clear plaintiff and Rager have an association due to their blood relationship. However, the evidence does not show plaintiff and Rager formed an association for the purpose of engaging in protected activity. Plaintiff was a teacher, not an advocate. In her declaration, plaintiff does not indicate she expressed her association with Rager to others. She mentions no events or actions she took to publicly express support for Rager's advocacy. The only event plaintiff mentions involving Koss was when the school secretary introduced plaintiff to Koss by saying, "[y]ou know who this is, don't you. . . . Ms. Rager's sister?" (Doc. 19, Ex. 1 ¶ 6.) In her deposition plaintiff states, "I never discussed my sister with Mr. Hill because I felt like her job was completely separate from mine." (Doc. 19, Ex. 3 at 51.) Plaintiff only states that she believes Hill knew Rager was her sister all along. (*Id.*) Plaintiff also indicates she did not know the details of the due process Rager was involved in "because my sister doesn't tell me," and "[w]e didn't discuss her case load." (*Id.* at 51, 96.)

The evidence presented suggests the Board's decision not to re-hire plaintiff was based upon performance issues outside the classroom. In fact, Hill believed that "[w]hen [plaintiff] focused on teaching, she did a good job." (Doc. 16, Ex. 2 at 2.) However, Hill believed plaintiff found ways to be away from her students, such as spending time in the hall chatting, or in the teachers' lounge. (*Id.*) It was also reported to Hill that plaintiff

was late for class and on the computer instead of teaching students. (*Id.*) Hill was concerned that plaintiff was not passionately interested in teaching. (*Id.*) Koss also believed plaintiff's focus and attention was not on "teaching the student." (Doc. 16, Ex. 3 at 1.) Koss found plaintiff was more interested in chatting with other employees, and spending time in the hall and teachers' lounge. (*Id.*) In addition, the student's main teacher complained that plaintiff was not spending the appropriate time with the student. (*Id.*) Koss found that plaintiff arrived late to school, and she was often out of her room and away from the student; other times the student accompanied her, but no instruction was given. (*Id.* at 2.)

Despite these assertions by Hill and Koss, in her opposition brief, plaintiff states she believes Hill did not like her from the time he learned plaintiff was Leslie Rager's sister. (Pl.'s Br. in Opp'n at 3.) Plaintiff bases this conclusion on her evaluation and observation forms for each year. However, in her deposition, although plaintiff stated she became aware of animosity between Rager and Hill during her second year, plaintiff stated, "I don't know that they had ever truly gotten along." (Doc. 19, Ex. 3 at 97-98.) Plaintiff's performance evaluation scores declined gradually during her three years. This suggests her scores may not be related to Hill's relationship with Rager. If Hill never liked Rager, he could have given plaintiff negative evaluations all three years. This evidence is insufficient for plaintiff to prove her association with her sister was a substantial or motivating factor in the Board's decision not to re-hire plaintiff.

As in the *Cutcliffe* case, plaintiff has presented little evidence other than her familial relationship with Rager, who is an advocate for disabled children. There is no evidence presented to suggest plaintiff supported, or even knew of, the details involving Rager's advocacy for Price against the Board. Plaintiff has presented insufficient evidence on which a reasonable jury could find that plaintiff's association with her sister, Rager, was a substantial or motivating factor in the Board's decision not to re-hire plaintiff as a teacher for hearing impaired children.[3] Accordingly, the court finds it unnecessary to address whether the Board would have made the same employment decision absent protected conduct.[4] The court finds plaintiff has failed to show that defendants' actions violated her right to freedom of association under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

---

[3] In Alabama, school boards are not required to re-hire teachers who do not have tenure status, and a hearing is not required. *See* Ala. Code § 16-24-2; *James v. Bd. of Sch. Comm'rs of Mobile County, Ala.*, 484 F. Supp. 705, 716-17 (S.D. Ala. 1979); *Haas v. Madison County Bd. of Educ.*, 380 So. 2d 873, 876 (Ala. Civ. App. 1980). Plaintiff worked for the Board for only three years, and was not re-hired. Therefore, she never obtained tenure status in her position as a teacher for hearing impaired students. "Granting tenure status creates a permanent expectation of continued employment and status should not be granted unless . . . the teacher will perform very well for her entire career." (Doc. 16, Ex. 2 at 2.) The Board felt plaintiff did not meet the proper expectations and did not re-hire her.

[4] The court will not discuss the third prong in this case. However, assuming plaintiff carried the burden of proving that her association with Rager was a substantial or motivating factor in the Board's decision, the Board has put forth legitimate reasons for not renewing plaintiff's contract despite her association with her sister.

## IV. Conclusion

For the reasons stated herein, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 28th day of September, 2004.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge